# SUPPLEMENT.

### OPINION OF THE JUSTICES TO THE SENATE.

If the period of the lease of the property and franchises of the Boston Elevated Railway Company to the Commonwealth, as provided in Spec. St. 1918, c. 159, is extended for a term of years, the General Court may provide that the Commonwealth shall guarantee the payment of principal and interest of any securities of the company that the public trustees may be authorized to issue for the purpose of effecting economies in the fiscal management of the company and of promoting more efficient service by it.

Such guarantee would not violate art. 62 of the Amendments to the Constitution of the Commonwealth or any other constitutional provision.

The fact that such securities might be outstanding after the termination of the period of public operation and management would not render such a guarantee inconsistent with art. 62 of the Amendments to the Constitution or with any other constitutional provision.

It is constitutionally competent for the General Court to exempt such securities in the hands of their holders from taxes levied under authority of the Commonwealth.

It is constitutionally competent for the General Court to effect the retirement of preferred stock of the company issued under and in accordance with St. 1911, c. 740, § 2, and of any other class or classes of the company's stock without the consent of the holders thereof by the exercise of the power of eminent domain; and provisions of a certain bill proposed in the Senate looking toward that end were stated in an Opinion of the Justices to be constitutional.

Certain sections of such a proposed bill providing for the retirement of the corporation's preferred stock would not be repugnant to the provisions of the Federal Constitution or of the Constitution of this Commonwealth.

Under any extension of the lease of the property and franchises of the company provided in Spec. St. 1918, c. 159, or of the present system of public operation and management of the company, the provisions of art. 63 of the Amendments to the Constitution of the Commonwealth would not apply to receipts of the company during the period of such lease or of such system of operation and management, moneys received during that period in the management of the corporation not being "received on account of the commonwealth."

Any such extension of the lease or of the system of public operation and management would not be repugnant to the provisions of art. 59 of the Amendments to the Constitution of the Commonwealth or to any provision thereof.

If provisions of a proposed bill pending in the Senate and entitled "An Act extending the term of the lease to the Commonwealth of the properties of the Boston Elevated Railway Company and continuing public management and operation thereof," and containing provisions for the retirement of the company's preferred stock, were enacted into law, the General Court thereafter could not, by virtue of art. 59 of the Amendments to the Constitution of the Commonwealth, amend, alter or repeal any provisions of the bill as were declared thereby and by Spec. St. 1918, c. 159, to constitute a contract binding upon the Commonwealth.

If the bill of the character above described were enacted by the General Court, it would not be subject to the referendum provisions of art. 48 of the Amendments to the Constitution of the Commonwealth.

Having given their opinions under c. 3, art. 2 of the Constitution upon specific questions relating to the constitutional power of the General Court to enact a bill covering over fourteen pages of the printed record and of the character above described, the Justices respectfully asked to be excused from answering the question, "Would any provision of said bill be unconstitutional if enacted into law?"

THE following order was passed by the Senate on April 15, 1927, and was transmitted to the Justices of the Supreme Judicial Court on April 20, 1927:

WHEREAS, There is pending before the General Court a bill entitled "An Act extending the term of the lease to the Commonwealth of the properties of the Boston Elevated Railway Company and continuing public management and operation thereof" (printed as Senate, No. 276, as amended), a copy of which is hereto annexed, relating to the policy to be pursued by the Commonwealth in regard to the continuance of the public operation and management of the Boston Elevated Railway Company; and

WHEREAS, The Senate is of the opinion that the General Court ought not to proceed further in its consideration of the issues involved until certain grave constitutional questions arising therein are disposed of; therefore be it

ORDERED, That the opinions of the Honorable the Justices of the Supreme Judicial Court be required on the following important questions of law: —

1. If the period of the lease of the property and franchises of said company to the Commonwealth, as provided in chapter one hundred and fifty-nine of the Special Acts of nineteen hundred and eighteen, is extended for a term of

years, may the General Court provide that the Commonwealth shall guarantee the payment of principal and interest of any securities of the company that the public trustees may be authorized to issue for the purpose of effecting economies in the fiscal management of the company and of promoting more efficient service by said company?

2. Would such guarantee violate the sixty-second article of the Amendments to the Constitution of the Commonwealth or any other provision thereof?

3. Would the fact that such securities might be outstanding after the termination of said period of public operation and management render such a guarantee inconsistent with said sixty-second article or with any other constitutional provision?

4. Is it constitutionally competent for the General Court to exempt such securities in the hands of their holders from all taxes levied under State authority?

5. Is it constitutionally competent for the General Court to effect the retirement of preferred stock of the company issued under and in accordance with section two of chapter seven hundred and forty of the acts of nineteen hundred and eleven and of any other class or classes of the company's stock, without the consent of the holders thereof, by the exercise of the power of eminent domain or otherwise?

6. Would sections twelve to fourteen, inclusive, of said bill, providing for the retirement of the company's preferred stock, be repugnant to the provisions of the Constitution of the United States prohibiting a State from passing any law impairing the obligation of a contract or to any other provision of said Constitution or of the Constitution of the Commonwealth?

7. Under any extension of the said lease or of the present system of public operation and management of said company, would the provisions of the sixty-second article of the Amendments to the Constitution of the Commonwealth apply to the receipts of the company during the period of such lease or of such system of operation and management?

8. Would any such extension be repugnant to the provisions of the fifty-ninth article of the Amendments to the

Constitution of the Commonwealth or to any other provision thereof?

9. If said bill were enacted into law could the General Court thereafter, by virtue of the said fifty-ninth article, constitutionally amend, alter or repeal such provisions of said bill as are declared thereby and by said chapter one hundred and fifty-nine to constitute a contract binding upon the Commonwealth, or any of them?

10. If said bill were enacted by the General Court would it be subject to the referendum provisions of article forty-eight of the Amendments to the Constitution?

11. Would any provision of said bill be unconstitutional if enacted into law?

The proposed statute referred to in the above order as "Senate, No. 276 as amended" read as follows:

An Act extending the term of the lease to the Commonwealth of the properties of the Boston Elevated Railway Company and continuing public management and operation thereof.

Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:

SECTION 1. Section one of chapter one hundred and fifty-nine of the Special Acts of nineteen hundred and eighteen is hereby amended by striking out, in the eighth to tenth lines, inclusive, the words "for the term of ten years from the date when they assume the management of the company as hereinafter provided" and inserting in place thereof the words: — until July first, nineteen hundred and twenty-eight, — by striking out, in the twenty-first and twenty-second lines, the words "twenty-five of chapter five hundred and fourteen of the acts of nineteen hundred and nine" and inserting in place thereof the words: — forty of chapter two hundred and seventy-one of the General Laws,— by striking out, in the twenty-seventh and twenty-eighth lines, the words "one of chapter seven of the Revised" and inserting in place thereof the words:— three of chapter twelve of the General,— and by striking out the last para-

graph and inserting in place thereof the following:— On July first, nineteen hundred and twenty-eight, or, if this act is not accepted until after said date, as soon after said acceptance as practicable, the governor, with the advice and consent of the council, shall appoint five trustees for terms of two, four, six, eight and ten years, respectively, from July first, nineteen hundred and twenty-eight, and thereafter, as the terms of the members so appointed expire, their successors shall be appointed in like manner for terms of ten years each, but not exceeding the period of public management and operation. The board shall organize every two years by the election of a chairman. Each trustee so appointed shall take office upon his appointment and qualification. The foregoing provisions of this section applicable to the first board of trustees appointed hereunder relative to salary, filling of vacancies, designation of chairman, and removals, shall apply to their successors appointed as aforesaid in the year nineteen hundred and twenty-eight or thereafter, except that the chairman and the member chosen as clerk shall each receive a salary of fifty-five hundred dollars,— so as to read as follows:— *Section 1.* The board of trustees of the Boston Elevated Railway Company is hereby created, to consist of five persons to be appointed by the governor, with the advice and consent of the council. The persons so appointed shall be sworn before entering upon the performance of their duties; shall own no stock or other securities of the Boston Elevated Railway Company or of any company owned, leased or operated by it; shall serve until July first, nineteen hundred and twenty-eight, and until their successors are duly appointed and qualified, and each shall receive from the company as compensation for his services five thousand dollars annually. In case of any vacancy in said board by reason of death, resignation or otherwise, the governor, by and with the consent of the council, shall fill the vacancy. The board shall designate one of the trustees so appointed to serve as chairman. Any member of the board may be removed for cause by the governor, with the advice and consent of the council.

Said trustees shall not be considered public officers within

the meaning of section forty of chapter two hundred and seventy-one of the General Laws, but shall be subject in all other respects to the provisions of said section to the same extent as are the directors of the Boston Elevated Railway Company, but said section shall not apply to recommendations by the governor to said trustees. The provisions of section three of chapter twelve of the General Laws shall not apply to the said board.

On July first, nineteen hundred and twenty-eight, or, if this act is not accepted until after said date, as soon after said acceptance as practicable, the governor, with the advice and consent of the council, shall appoint five trustees for terms of two, four, six, eight and ten years, respectively, from July first, nineteen hundred and twenty-eight, and thereafter, as the terms of the members so appointed expire, their successors shall be appointed in like manner for terms of ten years each, but not exceeding the period of public management and operation. The board shall organize every two years by the election of a chairman. Each trustee so appointed shall take office upon his appointment and qualification. The foregoing provisions of this section applicable to the first board of trustees appointed hereunder relative to salary, filling of vacancies, designation of chairman, and removals, shall apply to their successors appointed as aforesaid in the year nineteen hundred and twenty-eight or thereafter, except that the chairman and the member chosen as clerk shall each receive a salary of fifty-five hundred dollars.

SECTION 2. Section two of said chapter one hundred and fifty-nine is hereby amended by inserting after the word "trustees" in the first line the words:— and their successors, — by striking out, in the fourth, fifth and sixth lines, the words, "for a period of ten years, commencing on the first day of the month next after their appointment and qualification" and inserting in place thereof the words:— until July first, nineteen hundred and forty-three,— and by inserting after the word "fares" in the seventeenth line, the words: — and charges for all service rendered or operated, — and by inserting after the word commission, in the twentieth

line, the words: — ; provided, that no established line or any portion thereof, or the service thereon, shall be discontinued in any city or town served by the company, without the consent of the mayor and city council or of the board of selectmen, as the case may be, after a public hearing thereon, — so as to read as follows: — *Section 2.* Said board of trustees and their successors, hereinafter called the trustees, shall manage and operate the Boston Elevated Railway Company, hereinafter called the company, and the properties owned, leased or operated by it, until July first, nineteen hundred and forty-three, and, subject to the provisions of this act, shall take and have possession of said properties in behalf of the Commonwealth during the period of public operation, and, for the purposes of this act, shall, except as is otherwise provided in this act, have and may exercise all the rights and powers of said company and its directors, and, upon behalf of said company, shall receive and disburse its income and funds. They shall have the right to appoint and remove in their discretion the president, treasurer and clerk of the corporation, and all officers of the company other than the board of directors. They shall have the right to regulate and fix fares and charges for all services furnished or operated, including the issue, granting and withdrawal of transfers, and the imposition of charges therefor, and shall determine the character and extent of the service and facilities to be furnished, and in those respects their authority shall be exclusive and shall not be subject to the approval, control or direction of any other state board or commission; provided, that no established line or any portion thereof, or the service thereon, shall be discontinued in any city or town served by the company, without the consent of the mayor and city council or of the board of selectmen, as the case may be, after a public hearing thereon.

In the management and operation of the said company and of the properties owned, leased or operated by it, as authorized by this act, the trustees and their agents, servants and employees shall be deemed to be acting as agents of the company and not of the Commonwealth, and the company shall be liable for their acts and negligence in such manage-

ment and operation to the same extent as if they were in the immediate employ of the company, but said trustees shall not be personally liable. A majority of the board shall constitute a quorum for the transaction of business, and the action of a majority of those present at any meeting shall be deemed the action of the trustees.

Nothing herein contained shall be held to affect the right of the Commonwealth or any subdivision thereof to tax the company or its stockholders in the same manner and to the same extent as if the company had continued to manage and operate its own property.

SECTION 3. Said chapter one hundred and fifty-nine is hereby further amended by striking out section three and inserting in place thereof the following: — *Section 3.* The trustees shall have authority to make contracts in the name and on behalf of, and to issue stocks, bonds and other evidences of indebtedness of, the company, and may dispose of any preferred stock so issued without first offering the same to the stockholders. No contracts for the operation or lease of any subways, elevated or surface lines in addition to those now owned, leased or operated by the company, or any extensions thereof beyond their present limits, shall be entered into which shall involve the payment of any rental or other compensation by the company beyond the period of public operation without the consent of the directors of the company, but surface lines may be constructed or purchased beyond the limits of existing surface lines after consent of the directors has been refused, if the trustees shall determine, after a public hearing, that public necessity and convenience require such construction or purchase; provided, however, that if the Commonwealth shall elect under the provisions of section twelve to discontinue the public management and operation of the company's property, no such surface lines shall thereafter be constructed or purchased without such consent. The trustees shall cause to be paid all amounts which may from time to time become due from the company, and shall declare dividends at the appointed times upon the stock of the company and provide for the payment of the same.

SECTION 4. Said chapter one hundred and fifty-nine is hereby further amended by striking out section six and inserting in place thereof the following: — *Section 6.* The trustees shall from time to time, in the manner hereinafter provided, fix such rates of fare and schedules of charges for all services furnished or operated as will reasonably insure sufficient income to meet the cost of the service, which shall include operating expenses, taxes, rentals, interest on all indebtedness, an annual payment of two hundred and fifty thousand dollars into the special retirement or sinking fund to be accumulated for the purpose of retiring bonds issued under section fifteen, an annual sum of seven hundred and fifty thousand dollars representing a part of the saving in the amount of dividend charges and other economies herein provided for, such allowance as they may deem necessary or advisable for depreciation of property and for obsolescence and losses in respect to property sold, destroyed, or abandoned, all other expenditures and charges which under the laws of the Commonwealth now or hereafter in effect may be properly chargeable against income or surplus, fixed dividends on all preferred stock of the company from time to time outstanding, and dividends on the common stock of the company from time to time outstanding at the rate of six per cent per annum on the par value thereof to and including July first, nineteen hundred and twenty-eight, and five per cent per annum on the par value thereof during the balance of the period of public operation. Dividends upon the common shares shall be payable quarterly, but no dividends shall be paid upon such common shares in excess of the rates herein specified.

Said annual sum of seven hundred and fifty thousand dollars shall so long and so far as may be necessary therefor be used to repay to the Commonwealth the balance of the amount paid by it under the provisions of section eleven, for distribution among the cities and towns which were assessed therefor; and after said amount has been paid in full shall be used for payment of rentals and other fixed charges in respect to subways, tunnels, elevated and surface lines, and other improved transportation facilities, if any, operated

in addition to those operated at the time of acceptance of this act.

SECTION 5. Said chapter one hundred and fifty-nine is hereby further amended by striking out section seven and inserting in place thereof the following:— *Section 7*. The trustees·shall from time to time fix and put in operation rates of fare and schedules of charges for all services furnished or operated which in their judgment will produce sufficient annual income to meet the cost of service, as defined in section six, without impairment of the amount of the reserve fund as originally established.

If at any time the trustees shall be of opinion that said rates of fare or schedules of charges should be changed either with regard to the method or basis upon which the fares and transfer privileges or schedules are established, or because the same or any of them are too small or too great, or for any other reason, the trustees may adopt and put into effect new schedules or rates of fare which in their judgment will provide sufficient annual income to meet the cost of service, as defined in section six, without impairment of the amount of the reserve fund as originally established.

SECTION 6. Said chapter one hundred and fifty-nine, as amended in section ten by chapter two hundred and forty-five of the Special Acts of nineteen hundred and nineteen, is hereby further amended by striking out said section and inserting in place thereof the following:—*Section 10*. If as of the last day of June in any year the amount of the reserve fund shall exceed the amount originally established by not less than two million dollars and the income shall have exceeded the cost of service in each of the two preceding twelve months' periods by not less than one million dollars, the trustees shall within three months thereafter put into effect a reduction in the schedules or rates of fare; and if as of such date the amount of the reserve fund shall be less than thirty per cent of the amount originally established and during the preceding twelve months the income has been less than the cost of service, the trustees shall within one month thereafter put into effect a higher schedule or rate of fare. Nothing herein shall impair the authority given by section

seven. In determining the amount of the reserve fund, for the purpose of this section only, there shall first be deducted therefrom any amounts which have been paid by the Commonwealth to the company under the provisions of section eleven and for which the Commonwealth has not been reimbursed.

SECTION 7. Section twelve of said chapter one hundred and fifty-nine is hereby amended by striking out, in the third and fourth lines, the words "the expiration of said ten year period" and inserting in place thereof the words:— July first, nineteen hundred and forty-three,— and by striking out, in the eighth and ninth lines, the words "at the expiration of the said ten year period" and inserting in place thereof the words: — on said date,— so as to read as follows: — *Section 12.* Notwithstanding anything contained in this act, the public management and operation of the railway system of the company shall continue after July first, nineteen hundred and forty-three, upon the terms and conditions herein specified until such time as the Commonwealth shall elect to discontinue such public management and operation. The Commonwealth shall have the right to terminate such public management and operation, either on said date or at any time thereafter, by appropriate legislation passed not less than two years before the date fixed for such termination.

SECTION 8. Section thirteen of said chapter one hundred and fifty-nine is hereby amended by adding at the end thereof the following:— ; provided, however, that in the event of the exercise by the Commonwealth or any political subdivision thereof of the option contained in section sixteen, or of taking by eminent domain, such excess may be used toward payment of the purchase price or damages,— so as to read as follows: — *Section 13.* It shall be the duty of the trustees to maintain the property of the company in good operating condition and to make such provision for depreciation, obsolescence and rehabilitation, that, upon the expiration of the period of public management and operation, the property shall be in good operating condition. If the period of public management and operation expires,

control of the property shall then revert to the company, and if at that time the reserve fund shall be less than the amount originally established because the income during the period of public management and operation has been insufficient to pay the cost of the service, the Commonwealth shall forthwith pay over to the company an amount sufficient to restore it to its original amount; and if the amount in said reserve fund is then in excess of the amount originally established and any amount required to meet the cost of the service to the expiration of such period, such excess shall be paid into the treasury of the Commonwealth and distributed among the cities and towns in which the company operates in the same proportions as the assessments provided for by section fourteen; provided, however, that in the event of the exercise by the Commonwealth or any political subdivision thereof of the option contained in section sixteen, or of taking by eminent domain, such excess may be used toward payment of the purchase price or damage.

SECTION 9. By the acceptance of this act as provided in section sixteen, the company agrees that in no event at any time hereafter shall dividends in excess of six per cent per annum be declared or paid upon its common stock and that in any valuation of its property for rate-making purposes there shall be deducted an amount equal to whatever sums shall have been accumulated in the sinking fund provided by section fifteen hereof, including therein any bonds issued under said section, and purchased or retired therefrom.

SECTION 10. Section sixteen of said chapter one hundred and fifty-nine is hereby amended by striking out the last paragraph and inserting in place thereof the following:—

The provisions of this section shall not preclude the Commonwealth or any political subdivision thereof from acquiring the property and franchises of the Boston Elevated Railway Company at any time through the exercise of the power of eminent domain, and in the event of such taking the compensation to be paid to the company shall not be enhanced by reason of the passage of this act or of its amendments.

In case of such acquisition by eminent domain the com-

pensation payable thereunder shall not exceed a sum equal to the total outstanding shares of the company's capital stock multiplied by a sum equal to the average paid-in price of such shares in addition to the assumption of the company's entire outstanding indebtedness; or, at the election of the Commonwealth or of any such political subdivision exercising said power of eminent domain, the compensation as established in eminent domain proceedings shall be reduced by the amount of bonds issued and retired under section fifteen.

In case of liquidation or dissolution of the company the holders of the shares of common stock of the company shall not be entitled to receive for each share thereof a sum exceeding one hundred and ten dollars.

SECTION 11. Upon the appointment of the trustees whose term of service dates from the first day of July, nineteen hundred and twenty-eight, the trustees shall call, retire and cancel all preferred stocks issued under the authority of chapter seven hundred and forty of the acts of nineteen hundred and eleven or of said chapter one hundred and fifty-nine, as hereinafter provided. On or subsequent to said date, owners of shares of said preferred stocks the certificates of which have not been stamped "non assenting" as provided in section twelve, may and shall present the same to the treasurer of the company, or to such bank or trust company as may be designated by the trustees, for the purpose of surrender and cancellation, and shall receive in exchange therefor the bonds of the company issued under section fifteen on the following basis:— for each share of first preferred stock, bonds to the face value of one hundred and thirty dollars; for each share of the second preferred stock, bonds to the face value of one hundred and fifteen dollars; and for each share of the preferred stock, bonds to the face value of one hundred and five dollars, together with accrued dividends in cash at the rates fixed for each of said classes from the last dividend date thereof to the day of the appointment of the trustees as aforesaid.

Any owner of common or preferred stock of the West End Street Railway Company whose stock has not been

exchanged under the provisions of chapter seven hundred and forty of the acts of nineteen hundred and eleven may surrender the same and receive the proportionate amounts in bonds as aforesaid to which he would have been entitled if such exchange had been made.

Such provision for cases of stock certificates lost or destroyed may be made as the trustees shall determine.

SECTION 12. If this act is accepted as hereinafter provided, the trustees, in the name and on behalf of the company, shall forthwith notify each of the preferred stockholders of said action by registered letter addressed to each stockholder as his address appears upon the records of the company, and by publication in two daily newspapers published in the city of Boston, once each week for three successive weeks.

Any holder of shares of any class of preferred stock of the company who did not vote either in person or by proxy in favor of the acceptance of this act, may, within one hundred and twenty days after the date of the meeting at which was adopted the vote to accept this act, file with the clerk of the company or with the bank or trust company appointed by the company as the transfer agent of the class of preferred stock held by him, a writing addressed to the company declaring his opposition to the acceptance of this act and stating the number of shares held by him and the number or numbers of the certificate or certificates evidencing the same, and shall at the same time present to said clerk or said bank or trust company the certificate or certificates of stock evidencing said shares, to be stamped "non assenting".

Upon transfer thereafter of any shares evidenced by certificates so stamped "non assenting", the certificates for said shares issued to the transferee shall, in all cases, be likewise stamped "non assenting". And the holder of such shares shall not be entitled, except with the consent of the trustees, to surrender the same and receive therefor the bonds of the company on the basis of valuation specified in section eleven, but shall be entitled, if such shares represent preferred stock issued under section five of said chapter one hundred and fifty-nine, to receive for each such share the sum of one hundred and five dollars and accrued dividends, and the

trustees shall request the holders of such stock to surrender their shares for retirement, in accordance with the provisions of said section. The holders of all first and second preferred shares so stamped "non assenting" shall be entitled to receive the cash value of said shares to be determined as provided in section thirteen. The clerk of the company shall forthwith notify the bank or trust company acting as transfer agent of all certificates stamped by him as "non assenting", and said transfer agents shall at all times keep a separate record of certificates outstanding stamped "non assenting".

SECTION 13. Any stockholder of the company who owns any share or shares of its first or second preferred stock, the certificates evidencing which are stamped "non assenting" as above provided, may at any time within one year after the same have been presented for such stamping, request that his said shares be valued as hereinafter provided, and the value thereof shall in such case be paid, tendered or deposited to or for the account of such holder in the manner following: — The stockholder may file a petition in the Supreme Judicial Court within and for the county of Suffolk, setting forth the material facts and asking that the value of his shares may be determined. Thereupon, and upon such notice to all parties concerned as it may deem proper, the court shall pass an order requiring the certificate or certificates evidencing such shares, and duly endorsed, to be deposited with the clerk of the court, and shall, unless application for trial by jury is made in said petition, appoint three commissioners to ascertain and report the value of the shares. The report shall be made to the court as soon as is practicable, and, after due notice to the parties in interest, shall be confirmed by the court unless some error of law be made to appear upon the face of the report, in which event it shall be recommitted to the commissioners with such order as the court may make. If a trial by jury is claimed by either party, the court shall order the question of the value of the shares to be tried and determined by a jury in the superior court in the same manner in which other civil cases are tried in that court.

The company shall be liable for and shall pay all sums found due and payable to all holders of shares in the proceedings aforesaid, including such interest, cost and expenses as the court may order, and shall likewise furnish such security for the said payment as the court may order. For the purpose of this section the value of the shares shall neither be increased nor diminished by reason of the provisions of this act or the lease of the property of the company to the Commonwealth hereunder.

SECTION 14. Upon payment, or tender or deposit with the clerk of the court of the value of said shares fixed as aforesaid, such "non assenting" shares and the certificate or certificates thereof shall become the property of and shall be transferred and delivered to the company whose right and title to receive the same and to hold possession thereof may be enforced by the court by any appropriate process, and the company shall upon receipt of such certificate cancel the same.

Exceptions may be taken to any ruling or order of said court, to be heard and determined as in other civil cases. The court may make all such orders for the enforcement of the rights of any party to the proceedings, for consolidation of two or more petitions and their reference to the same commissioners, for the consolidation of claims for a trial by jury and framing of issues therefor, for deposit of money in court, and for the payment of interest upon the value of the stockholders' shares as determined and the payment of costs by one party to the other, as justice and the speedy settlement of the matters in controversy may require. The attorney general, in behalf of the Commonwealth, shall be made a party to such proceedings and be entitled to be heard therein.

SECTION 15. At any time and from time to time after this act takes effect, the trustees shall have authority in the name and on behalf of the company and without other authorization than herein contained, in addition to the bonds, coupon notes or other evidences of indebtedness payable at periods of more than twelve months after the date thereof which the company may otherwise lawfully issue for capital purposes, to issue bonds of the company to an amount not

exceeding twenty-eight million dollars. Such bonds or the proceeds thereof shall be used for the purchase or retirement of the existing preferred stocks of the company as hereinbefore provided, for the payment of judgments recovered for the value of any non assenting stock as provided in section thirteen, and the balance for capital purposes for which the company may lawfully issue stocks or bonds. Said bonds shall bear interest at the rate of four and one-half per cent per annum, shall be for the term of forty years, and may contain such provision for call in whole or in part as the trustees may determine.

The Commonwealth shall guarantee the payment of the principal and interest of all bonds issued under the authority hereof, and the state treasurer shall upon request indorse such guaranty thereon.

In case the Commonwealth shall be called upon to make any payment by virtue of said guaranty, the amount paid on account thereof, together with any interest or other charges, shall be assessed upon the cities and towns in which service under this act is operated, by an addition to the state tax next thereafter, assessed in proportion to the number of persons in said cities and towns using the service at the time of said payment, said proportion to be determined and reported to the state treasurer by the trustees from computations made in their discretion for the purpose.

The trustees shall annually deposit in a special retirement or sinking fund to be accumulated for the purpose of retiring said bonds at maturity the sum of two hundred and fifty thousand dollars. Said special fund shall be used for no other purpose, except that it may likewise be used for purchasing any of said bonds before maturity at not more than the call price stipulated thereon. Said fund may be invested in income-producing securities in the discretion of the trustees and all income accruing therefrom shall be added to the fund.

The payment of interest as it accrues on said bonds, and also the annual deposits required as aforesaid, shall be deemed part of the cost of service as defined in section six of said chapter one hundred and fifty-nine.

Said bonds, both as to principal and income, are hereby made exempt from all taxes levied under authority of the Commonwealth and shall contain a recital to such effect.

SECTION 16. This act shall take effect upon its acceptance by the holders of not less than a majority of each class of the stock of the Boston Elevated Railway Company, given at a meeting called for the purpose, and the filing of a certificate of such acceptance with the secretary of the Commonwealth; provided, that such acceptance is filed not later than October fifteenth, nineteen hundred and twenty-seven. A vote to accept this act, cast by any holder of preferred stock in the company, shall constitute an assent on the part of such stockholder to surrender for cancellation all the preferred stock held by him at the price hereinbefore assigned as the value thereof in exchange for the bonds of the company, as provided in section eleven.

None of the provisions of this act or of said chapter one hundred and fifty-nine shall be construed to constitute a contract binding upon the Commonwealth, other than the provisions which define the term of the lease herein provided for and the terms and conditions under which, during said term of public management and operation, the property owned, leased or operated by the Boston Elevated Railway Company shall be managed and operated by the said trustees, the provisions of section thirteen of said chapter one hundred and fifty-nine, as amended by section eight of this act, and the provisions of section fifteen relative to the guaranty by the Commonwealth of the bonds of the company issued under said section fifteen, and the exemption thereof from taxation, which provisions shall constitute a contract binding upon the Commonwealth; but if during said period of management and operation the trustees shall be deprived of possession or control of said property by reason of any action to enforce any debt, claim or obligation which existed at the time the trustees took possession, the Commonwealth shall be under no obligation to pay any sum or sums under this act to meet any deficiency in income accruing while the trustees are deprived of such possession and control.

On November 22, 1927, the Justices returned the following answer:

To The Honorable the Senate of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit these answers to the questions set forth in the order adopted by the Honorable Senate on April 15, 1927. These questions relate to a pending bill (printed as Senate, No. 276 as amended) entitled, "An Act extending the term of the lease to the Commonwealth of the properties of the Boston Elevated Railway Company and continuing public management and operation thereof." It is in form and substance an amendment of Spec. St. 1918, c. 159. Copies of the order and bill are hereto annexed.

Provision was made by said c. 159 for the public operation through a board of trustees, appointed by the Governor, of the Boston Elevated Railway Company for a period of ten years and thereafter until such time as the Commonwealth shall elect to discontinue public management. That statute was in substance and effect a lease of the property of the railway company to the Commonwealth upon the terms therein specified. The validity of said c. 159 was upheld against attacks, founded upon certain of its provisions alleged to violate the Constitution, in *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, affirmed in *Boston* v. *Jackson*, 260 U. S. 309, and in *Chelsea* v. *Treasurer & Receiver General*, 237 Mass. 422. See *Opinion of the Justices*, 231 Mass. 603. The conclusions there reached are accepted without further discussion.

The first three questions of the present order raise the point broadly whether the Commonwealth may guarantee the payment of principal and interest of any securities of the Boston Elevated Railway Company which the trustees may issue under the authority of the proposed bill for the purpose of effecting economies in the fiscal management of the company and of promoting its more efficient service. Public money cannot be appropriated or public credit lent for the aid of private objects or enterprises. Such expenditures

can be made only for public purposes and to promote the general welfare. That is too clear for discussion. *Lowell* v. *Boston*, 111 Mass. 454. *Duffy* v. *Treasurer & Receiver General*, 234 Mass. 42, 50. *Opinion of the Justices*, 240 Mass. 616, 617. The Boston Elevated Railway is devoted to a public use and its operation and management concern the public welfare. The transportation of the people at large in the district served by the Boston Elevated Railway system is a matter in which the public and the government as the representative of the people have an interest. *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 414, and cases there collected. *Boston & Albany Railroad* v. *New York Central Railroad*, 256 Mass. 600. *Prince* v. *Crocker*, 166 Mass. 347. *Browne* v. *Turner*, 176 Mass. 9. *Sears* v. *Street Commissioners*, 180 Mass. 274, 279. The trustees take and have possession of the properties of the Boston Elevated Railway Company "in behalf of the Commonwealth during the period of public operation" by the express terms of said c. 159, § 2. The operation and management of the Boston Elevated Railway Company during the term of the lease are to be by a board of public officers for the promotion of the general welfare, although at the same time provision is made for the conservation of the private interests of the owners of the railway company. The Commonwealth, having taken possession of the property of the railway company for a public use, can expend public money for its support and operation. It follows that the purposes of the guarantee of the securities described in question 1 are public as distinguished from private, and that public moneys may be expended and the public credit pledged therefor.

It is provided by art. 62, § 1, of the Amendments to the Constitution that the "credit of the commonwealth shall not in any manner be given or loaned to or in aid . . . of any corporation which is privately owned and managed." Under said c. 159, as amended by the proposed bill, the Boston Elevated Railway Company, although privately owned, will not be privately managed. On the contrary, it is to be managed, controlled and operated wholly by the board of trustees who are appointed by the Governor, who constitute

a public board, who are for all essential purposes public officers although under said c. 159, § 2, "deemed to be acting as agents of the company and not of the commonwealth," and whose duties are prescribed by a public statute enacted by the General Court pursuant to its constitutional prerogatives.

The provision of § 1 of the proposed act, to the effect that the trustees shall not be considered public officers within the meaning of G. L. c. 271, § 40, does not impair or affect the general nature of their duties as public officers. The further provision exempting the trustees from the terms of G. L. c. 12, § 3, has no bearing upon the character of their service as public officers. For all other purposes they are public officers. They perform public functions.

The further provisions of § 3 of the proposed bill, to the effect that no contracts of the trustees for the operation or lease of additional subways, elevated or surface lines, or any extensions thereof, involving payment of rental or other compensation beyond the period of public operation shall be valid without the consent of the directors of the company, and that extensions or purchases of surface lines in certain conditions may not be made without such consent, do not affect the dominating features of the proposed bill stamping the management and operation of the corporation as public and not private. It is expressly provided by said c. 159, § 4, that during the period of public control the board of directors of the company shall "have no control over the management and operation of the street railway system." The entire responsibility of management and operation rests upon the trustees as public officers. This responsibility is not shared with the directors of the railway company.

In these circumstances there is nothing in art. 62 of the Amendments to the Constitution which would be violated by the guarantee by the Commonwealth of securities issued by the trustees as authorized in the proposed bill.

There is nothing in said art. 62 of the Amendments which restricts the lending of the credit of the Commonwealth to such corporations as were under public management at the time of its adoption. A provision of the Constitution com-

monly is to be interpreted as stating a broad and general principle of government, regulative of all conditions arising in the future and falling within its terms.    *Tax Commissioner* v. *Putnam*, 227 Mass. 522, 523, 524.

The circumstance that such securities may be outstanding at the termination of the period of public control and operation does not, in our opinion, render such guarantee by the Commonwealth inconsistent with art. 62 of the Amendments to the Constitution or with any other provision of the Constitution.    The minimum period of public control expires in 1943, while the term of the bonds authorized by § 15 of the proposed bill is forty years.    The proceeds of the bonds must be used under the proposed bill exclusively and with reasonable dispatch for the promotion of the public purposes therein set forth.    It is not the design of the proposed bill that such securities may be sold and the proceeds kept on hand until after the expiration of public control and then turned over to the private owners of the company. Although the proposed bill is not explicit upon this point, we interpret it as meaning that the trustees can sell such securities only to procure money to be expended by themselves or under their direction without unreasonable delay. So interpreted, the public will receive at once the benefit of the proceeds of the bonds and of the use of the credit of the Commonwealth thus given or loaned.    The delay in the payment of such bonds until after the termination of public control will have been determined by the Legislature, if the proposed bill be enacted, to be in the public interest.    Such delay does not in any particular affect the underlying facts that, at the time the public credit was pledged, public officers were the managers of the Boston Elevated Railway Company and the funds secured by such pledge of the public credit have been expended wholly for a public purpose under the direction of public officers.    Those are decisive factors under art. 62 of the Amendments.    The taxes which may be levied for reimbursement of the Commonwealth for any payments required of it by virtue of such guarantee need not be levied immediately upon the accrual of the public benefit, but

may be postponed until actual cost and loss fall upon the public treasury.

For these reasons we answer, "Yes" to question 1, and "No" to questions 2 and 3.

Question 4 is in effect whether such securities may lawfully be exempted from taxation under State laws. The proceeds from the sale of all such securities must be employed by the trustees under § 15 of the proposed bill either for the retirement or extinguishment of preferred stocks of the company, or for capital investments for which its stock may be issued. All such proceeds, therefore, will in substance and effect be invested in property of the company.

The General Court is authorized and required "to impose and levy proportional and reasonable assessments, rates, and taxes, upon all the inhabitants of, and persons resident, and estates lying, within the said commonwealth." C. 1, § 1, art. 4, of the Constitution. This constitutional mandate as applied to corporations means that property may be exempted from one form of taxation which bears its fair burden for the support of government through some other form of taxation. If the property of a corporation is taxed to it, its shares of stock may be exempted from taxation in the hands of stockholders. If property in which the proceeds of bonds are invested and by which they are secured is taxed, the bonds in the hands of their resident owners may be exempted from taxation. The principle upon which this kind of exemption rests is avoidance of double taxation, a principle upon which the Legislature has acted in numerous instances. *Salem Iron Factory Co.* v. *Danvers,* 10 Mass. 514. *Opinion of the Justices,* 195 Mass. 607, 610, 611. *United States Trust Co.* v. *Commonwealth,* 245 Mass. 75. *Opinion of the Justices,* 250 Mass. 590, 600, and cases there cited.

Provision has been made by general law for the taxation of what is deemed by the General Court the fair value of all the property of the Boston Elevated Railway Company, either by direct property tax or by excise. See G. L. c. 63, §§ 61–66, as amended by St. 1921, c. 406, and St. 1923, c. 358, § 3, c. 452; G. L. c. 59, §§ 2, 5 cl. 16, as amended by St. 1921, c. 486, § 16, St. 1924, c. 321, St. 1926, c. 279, § 1;

G. L. c. 59, § 5, cl. 32; and these statutes specially applicable to the Boston Elevated Railway Company: St. 1897, c. 500, § 10; St. 1898, c. 578, § 28, St. 1908, c. 388, Spec. St. 1917, c. 373, § 12, and Spec. St. 1918, c. 159, §§ 2, 17. A general law for the exemption from taxation of bonds and securities issued by all street railway corporations within the Commonwealth might perhaps be upheld under this principle of avoidance of double taxation. It is to be observed that the proposed bill contains no such exemption. The exemption is restricted to specified securities issued by the trustees as obligations of the Boston Elevated Railway Company. The bonds and securities of all other street railway and railroad corporations already issued or to be issued in the future are left subject to taxation under the general law. G. L. c. 59, § 4 Third. Doubtless, if the Commonwealth should take title to all property and franchises of the Boston Elevated Railway Company, they would be exempt from all taxation levied under State authority unless authorized by special statute. *Boston Fish Market Corp.* v. *Boston,* 224 Mass. 31, 34, and cases there cited. But the Commonwealth under the proposed bill will not become vested with such title. The Commonwealth merely takes and has possession of such property through the trustees, who are required to manage and operate but not to own the railway system. By the express terms of said c. 159, § 2, the right to tax the company as if in private ownership continued. Admittedly, the power of the Legislature is broad to grant exemption from taxation for proper purposes. All manner of reasonable classifications to that end may be made. But the power cannot be exercised in "clear and hostile discrimination between particular persons and classes." *Massachusetts General Hospital* v. *Belmont,* 233 Mass. 190, 200–205, and cases there reviewed. It is matter of common knowledge that there are numerous corporations in the Commonwealth performing in general the same kind of public service that is performed by the Boston Elevated Railway Company, differing mainly in the volume of business transacted. The bonds of all such companies are and are to remain subject to taxation. The only ground on which it can be thought that discrimination

against the bonds of such companies may be made in favor of the bonds here in question is that these bonds are to be issued by a public board in possession of the property of the railway company for a public use and are to be guaranteed by the Commonwealth, all for a public purpose and the general welfare. They thus will become in a sense an obligation of the Commonwealth. There can be no doubt of the power of the Commonwealth to exempt from taxation bonds and securities issued by it. The liability of the Commonwealth on these bonds, although not primary, may be enforced and may be substantial. For this reason we are of opinion that such bonds may be exempted from taxes levied under State authority. We answer Yes to question 4.

Question 5 in substance is whether the retirement of preferred and common stocks of the company may be effected by statute without the consent of the holders thereof by the exercise of the power of eminent domain, or otherwise.

It is an underlying principle of our system of government that every person holds all and every part of his property subject to being appropriated for public use by the government for its paramount needs upon payment of reasonable and just compensation. Declaration of Rights, Massachusetts Constitution, art. 10. Amendments to Constitution of the United States, art. 5. This power of government extends to personal as well as to real estate. This power of expropriation for public use extends to shares of stock in a corporation, which represent an undivided interest in its franchise and other property. *Offield* v. *New York, New Haven & Hartford Railroad,* 203 U. S. 372. *Cincinnati* v. *Louisville & Nashville Railroad,* 223 U. S. 390, 400. *Boston Water Power Co.* v. *Boston & Worcester Railroad,* 23 Pick. 360, 392, 393. *Central Bridge Corp.* v. *Lowell,* 4 Gray, 474, 481. It is competent for the General Court to effect the retirement of such stock by the exercise of eminent domain. Since that is the provision of the proposed bill, it seems unnecessary to discuss whether such retirement can be effected in any other way or upon any other principle.

It is provided by §§ 12–14, both inclusive, of the proposed bill that minority holders of several classes of stock in the

railway corporation, who have not voted in favor of accepting the proposed act as provided in § 16, may be compelled to surrender their shares to the company for retirement upon the terms therein specified. It is to be noted that the proposed act will not go into effect until accepted by the holders of a majority of each class of stock in the railway corporation. The proposed plan for retirement of the stock of nonassenting minority stockholders thus will be approved by the holders of a majority of the stock.

The provisions for the retirement of preferred stock issued under said c. 159, § 5, as set forth in § 12 of the proposed act, are in precise conformity to the conditions as to retirement contained in said § 5, which became an inherent quality or infirmity of such stock when issued. By accepting the stock on such conditions, the holders assented in advance to retirement of their shares upon such terms. They made their investment upon that footing. They cannot complain. *Haskell* v. *New Bedford,* 108 Mass. 208. *Opinion of the Justices,* 251 Mass. 569, at page 612, and cases there collected.

The provisions in §§ 13 and 14 of the proposed bill in effect are that the minority nonassenting holders of other classes of stock of the railway company shall surrender their shares for retirement at a price to be ascertained either (1) by an appraisal of their value by three commissioners appointed by the court, or (2) by trial by jury in the Superior Court to determine their value. Adequate provision is made for the correction of any errors of law in making such appraisal under each method. Upon payment of such value, title to those shares of stock shall vest in the railway company and the certificates of stock shall be cancelled.

The provisions as to ascertainment of the value of the shares are adequate and present no constitutional difficulty. *Opinion of the Justices,* 251 Mass. 569, 612–615, and cases there cited. *Long Island Water Supply Co.* v. *Brooklyn,* 166 U. S. 685.

The provision of § 13 of the proposed bill that, in ascertaining such value, enhancement or diminution thereof arising from the statute itself or the lease of the property of the

railway company to the Commonwealth shall be disregarded, is valid. *Smith* v. *Commonwealth*, 210 Mass. 259, 262, 263.

The question remains whether the broad provisions for compulsory retirement of stock are violative of any constitutional guaranty. It is to be borne in mind that these provisions are part of a bill proposed for the purpose of effectuating public management of a public utility. Title to the shares of stock does not vest in the Commonwealth but in the railway corporation. No general principle of law prevents the General Court from authorizing a corporation to acquire title to its own stock. *Worcester* v. *Board of Appeal*, 184 Mass. 460. The Boston Elevated Railway Company, being a public corporation for the transportation of passengers for hire, belongs to the class of corporations which may be empowered to exercise the power of eminent domain. We are of opinion that this power may be conferred under the conditions set forth in the proposed bill to acquire title by eminent domain to the shares of its own stock of nonassenting minority stockholders. The provisions of the proposed bill are ample respecting the ascertainment and payment of compensation for such shares. The authorization in § 15 of the proposed bill of the pledging of the credit of the Commonwealth for making payment for such shares is adequate assurance of prompt payment of the reasonable and just value of such shares. Therefore there is no violation of the constitutional prohibition against taking property without due process of law.

We answer to question 5 that it is constitutionally competent for the General Court to effect the retirement of such stock by the exercise of eminent domain as provided in the proposed bill.

Question 6 in effect inquires whether §§ 12–14, both inclusive, of the proposed bill, providing for the retirement of the preferred stock of the corporation, would be repugnant to art. 1, § 10, of the Constitution of the United States whereby the several States are forbidden to pass any "law impairing the obligation of contracts." It is elementary that ·one cannot by contract prevent the exercise of the powers of government in contravention of the terms of such contract.

Manifestly the terms of the contract between the railway company and its stockholders as to ownership of stock are subject to the exercise of the power of eminent domain as provided in the proposed bill.

We do not pause to discuss whether the proposed sections might also be enacted under the police power with respect to a corporation devoted to a public use, because, as already pointed out, these provisions are valid under the power of eminent domain. See *Boston & Albany Railroad* v. *New York Central Railroad*, 256 Mass. 600, 610; *Marcus Brown Holding Co. Inc.* v. *Feldman*, 256 U. S. 170; and *Boston Water Power Co.* v. *Boston & Worcester Railroad*, 23 Pick. 360.

We answer "No" to question 6.

Question 7 presents the point whether art. 63 of the Amendments to the Constitution (printed in the order as art. 62 by mistake, as we are informed) would apply to the receipts of the company during the period of public management. It is provided in § 1 of art. 63 that all "money received on account of the commonwealth from any source whatsoever shall be paid into the treasury thereof."

The railway company under the terms of the proposed bill remains in private ownership, although under the management of public officers. The income which may accrue from the property is in no sense public income, although restrictions are placed upon its use by the terms of the proposed bill. Profits which may accrue, save as thus restricted, belong to the railway company and not to the Commonwealth. Actions and suits for the recovery of obligations arising out of the public management must be brought by and against the railway company and not the Commonwealth. It follows that money received in the management of the railway company is not "received on account of the commonwealth" in the sense in which those words are used in said art. 63, § 1. See in this connection *United States* v. *McCarl*, 275 U. S. 1, decided by the United States Supreme Court on October 10, 1927.

We answer "No" to question 7.

The eighth question is whether any extension of the lease

of the railway company or of the present system of public management would be repugnant to the provisions of art. 59 of the Amendments to the Constitution. That article is in these words: "Every charter, franchise or act of incorporation shall forever remain subject to revocation and amendment."

The provisions of the proposed bill and of said c. 159, of which it is an amendment, constitute a lease of the property of the railway company to the Commonwealth. It is a contract to which the parties are the railway company as lessor and the Commonwealth as lessee. That is the main feature, although there are other provisions which prescribe the powers and duties of the public managers and which deal with certain financial aspects of the affairs of the railway company. Said c. 159 and the proposed bill are propositions on behalf of the Commonwealth presented to the railway company, which do not become operative until accepted by the railway company in the manner therein provided. There may be some features in said c. 159 and the proposed bill which in a sense are amendments of the franchise charter and act of incorporation of the railway company. So far as such features affect the charter, franchise and act of incorporation of the railway company, they are not general in character but merely to enable it to enter into and continue the lease, which is the main end of the proposed bill. For example, powers are conferred upon the railway company as to making the lease which it did not possess under its earlier acts of incorporation. All these, however, are subsidiary and incidental to the main purpose of said c. 159 and of the proposed bill providing for the lease of the property of the company to the Commonwealth.

The discussion in *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, shows that said c. 159 and the proposed bill differ fundamentally from a charter, franchise or act of incorporation. They constitute in substance and effect a contract as to public business between the Commonwealth and a public service corporation. It follows that there is nothing in them repugnant to the terms of art. 59 of the Amendments to the Constitution.

We answer "No" to question 8.

The inquiry presented by question 9 is whether the General Court may constitutionally amend, alter or repeal such provisions of the proposed bill and of said c. 159 as are therein declared to constitute a contract binding upon the Commonwealth. It is expressly provided by said c. 159, § 18, and by § 16 of the proposed bill that certain terms of said acts when accepted by the Boston Elevated Railway Company shall constitute contracts binding upon the Commonwealth. The public faith is thus pledged explicitly in this respect. These terms in legal intendment are contractual in their nature. These terms thus solemnly declared to be contracts are not in the nature of a franchise, charter or act of incorporation of the railway company. They are assertions by the Commonwealth of its design and purpose to treat them as simple commercial contracts and not as an exercise of the sovereign power of legislation in granting or amending a franchise, charter or act of incorporation. One branch of the power of the General Court is its authority "to stipulate for, purchase and obtain all such property, privileges, easements and improvements, as may be necessary or useful to the public," and "to bind the community by their contracts therefor." *Boston & Lowell Railroad* v. *Salem & Lowell Railroad*, 2 Gray, 1, 32. *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, at page 416. When the Legislature makes contracts of that nature, they are binding upon the Commonwealth and cannot by act of the Legislature alone be revoked or amended.

It was not the design or effect of said art. 59 to prevent the Commonwealth from entering into a binding contract with a domestic corporation, the terms of which would not be subject to revocation or amendment by act of the Legislature. The general design and effect of that amendment are to prevent a legislative act of granting a charter or franchise, or an act of incorporation remaining forever free from amendment under the contract clause of the Federal Constitution as interpreted by *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518. It may also have other bearings and results. But that article does not have the effect

of depriving the General Court of its power to make in the public interest a business contract not in the nature of a charter, franchise or act of incorporation which would bind the Commonwealth and not be subject to amendment or repeal. There is a plain distinction between a charter, franchise or act of incorporation and a pure contract touching public business between the Commonwealth and a public service corporation. The latter is not affected by art. 59 of the Amendments.

Although in general the laws as to taxation may be changed at the will of the legislative department of government, nevertheless the sovereign power itself may in certain conditions for the public welfare make a binding contract as to exemptions from taxation. *New Jersey* v. *Wilson,* 7 Cranch, 164. *Home of the Friendless* v. *Rouse,* 8 Wall. 430. *Massachusetts General Hospital* v. *Belmont,* 233 Mass. 190, 200. As to such contractual features, the proposed bill if enacted would not be subject to revocation and amendment without the consent of the railway company.

By way of precaution it may be added that neither the contract nor the due process clauses of the Constitution of the United States, nor any provisions of the Constitution of this Commonwealth, prevent or narrow the exercise of the police power. They do not have "the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; . . . this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and . . . all contract and property rights are held subject to its fair exercise." *Atlantic Coast Line Railroad* v. *Goldsboro,* 232 U. S. 548, 558. *Wellington, petitioner,* 16 Pick. 87, 101, 102. *Eastern Railroad* v. *Boston & Maine Railroad,* 111 Mass. 125, 130, 131.

We answer "No" to question 9.

The tenth question is whether the proposed bill would be subject to the referendum provision of art. 48 of the Amendments to the Constitution. It is provided in that article, "The Referendum," Part III, § 2, "*Excluded Matters*" that "No law . . . the operation of which is restricted to a

particular town, city or other political division or to particular districts or localities of the commonwealth . . . shall be the subject of a referendum petition."

This question must be answered with particular reference to § 15 of the proposed bill whereby it is provided that "in case the Commonwealth shall be called on to make any payment by virtue of said guaranty [of bonds of the railway company] the amount paid on account thereof . . . shall be assessed upon the cities and towns in which service under this act is operated," by an addition to the next State tax "assessed in proportion to the number of persons in said cities and towns using the service." The guaranty is an obligation of the Commonwealth. Provision is made for the immediate assessment of all expense actually incurred by the Commonwealth upon cities and towns particularly specified. It must be assumed that such assessments if and when required will be levied and collected as directed in the proposed bill. As a practical matter of government, the entire financial burden thus will fall exclusively upon such cities and towns and the Commonwealth will be relieved. We are of opinion that the effective operation of the proposed law is restricted to these particular cities and towns, and that therefore the proposed bill falls in the class of matters excluded from the operation of the referendum provision of the Constitution. *Opinion of the Justices,* 254 Mass. 617. We do not perceive any other provisions of the proposed bill which are not restricted in operation to the district served by the Boston Elevated Railway system or which bring it within the scope of the referendum provision of the Amendment.

We answer "No" to question 10.

The inquiry propounded by question 11 is whether any provision of the proposed bill would be unconstitutional if enacted into law.

In accordance with the established practice for the reasons set forth in *Opinion of the Justices,* 239 Mass. 606, 612, and *Opinion of the Justices,* 247 Mass. 589, 598, we respectfully ask to be excused from answering a general question of this nature.

The order transmitting these questions was received so near the end of the session of the General Court for 1927 that there was not time to make adequate answers before its prorogation.   We have therefore taken time for deliberation, and return these answers before the reassembling of the Honorable Senate.

<div style="text-align: right;">

ARTHUR P. RUGG.

HENRY K. BRALEY.

JOHN C. CROSBY.

EDWARD P. PIERCE.

JAMES B. CARROLL.

WILLIAM C. WAIT.

GEORGE A. SANDERSON.